**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**JEFFREY Z. BRYANT,**

       **Plaintiff,**                  **CIVIL ACTION NO. 9-CV-10318**

       **vs.**                           **DISTRICT JUDGE GEORGE CARAM STEEH**

**COMMISSIONER OF**          **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

       **Defendant.**
_____/

**REPORT AND RECOMMENDATION**

**I.**     **RECOMMENDATION:**    This Court recommends that Defendant's Motion for Summary Judgment (docket no. 15) be DENIED, that Plaintiff's Motion for Summary Judgment (docket no. 10) be GRANTED in part, and the instant case REMANDED pursuant to step four of 42 U.S.C. § 405(g)[1].

\*\*\*

**II.**     **PROCEDURAL BACKGROUND**

Plaintiff filed an application for disability and Disability Insurance Benefits on August 12, 2005 and Supplemental Security Income on August 31, 2005, alleging that he had been disabled and unable to work since January 1, 2001 due to multiple sclerosis. (TR 36, 68, 88). The Social Security Administration initially denied his claim. (TR 45-48). Following a June 16, 2008 hearing,

---

[1] Plaintiff asks only that the case be remanded for an award of benefits pursuant to 42 U.S.C. § 405(g). In this instance, however, a reversal and remand for further proceedings, not simply an award of benefits, is appropriate where not all essential factual issues have been resolved. *See Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

Administrative Law Judge David B. Washington denied Plaintiff's claim by finding that Plaintiff had not been under a disability from January 1, 2005 through the dated of the ALJ's July 15, 2008 decision. (TR 15, 21). The Appeals Council declined to review the ALJ's decision and Plaintiff commenced the instant action for judicial review. (TR 5-7). The parties filed Motions for Summary Judgment and the issue for review is whether Defendant's denial of benefits was supported by substantial evidence on the record.

### III.  PLAINTIFF'S TESTIMONY, MEDICAL EVIDENCE AND VOCATIONAL EXPERT TESTIMONY

#### A.  Plaintiff's Testimony and Reports

Plaintiff was 46 years old at the time of the administrative hearing. (TR 215). Plaintiff has a high school education and training as an automotive mechanical engineering technician. (TR 216). Plaintiff has past work experience as a plant maintenance mechanic at a water treatment plant, pipe fitting, and working with hydraulics. (TR 216-17). Plaintiff reported that he can no longer work because he tires quickly, he has a lack of coordination, no strength, memory loss and he has a loss of manual dexterity in his hands and fingers. (TR 89, 216). Due to his loss of balance, he can no longer climb up and down the machinery as required for his past job. (TR 216).

Plaintiff is single and lived with his seventeen year old son at the time of the hearing. (TR 215-16). He testified that his son is a great help at home. (TR 220). Plaintiff is able to drive. (TR 216). Plaintiff gets up at 5:30 a.m. during the week to make sure his son gets up for school. (TR 220). Then he sits and watches television, reads a book or researches multiple sclerosis (MS) on the internet before he lies down again. (TR 220). He then gets up for ten to fifteen minutes at a time to prepare food for dinner, alternating with one hour seated rest breaks. (TR 220). He does not know whether each day will be good or bad, whether he can prepare the dinner all at once in a half-

hour, or whether it will take all day. (TR 222). Between 9:00 a.m. and 5:00 p.m. he lies down for a total of four or five hours. (TR 222). He testified that due to fatigue he cannot be on his feet for more time than it takes to wash dishes, then he has to sit down for two hours. (TR 216). He can stand at the sink for twenty or thirty minutes before he has to sit. (TR 216, 219). Plaintiff testified that he has fallen several times and he falls if he tries to walk without his cane. (TR 217). Plaintiff has trouble with bladder urgency and uses the bathroom at least once per hour during the day. (TR 223). Most of the time he has a warning that he needs to go, but if he is very fatigued or if it is very hot, he has accidents. (TR 223).

Plaintiff was treated with steroids when he was first diagnosed with MS. (TR 217). He also had an injection of Avonex once per week into his thigh but the Avonex caused severe depression. (TR 217). He has also taken Copaxone injections, which has decreased the number of flare-ups. (TR 217). He testified that heat or stress cause dizziness, blurry vision and fatigue. (TR 217). If he sits for more than a half-hour to forty-five minutes it is difficult to get up and his balance is unsteady. (TR 217, 219). He testified that if he cannot get a handicapped parking place at the grocery store, he can walk 100 feet into the store to get in the scooter cart. (TR 218). Plaintiff testified that if he walks too much he "feels it" in his legs and hips and his eyes get blurry. (TR 218). He no longer has the grip to lift a gallon of milk, so he buys half-gallons. (TR 218). He takes coffee from a large can and moves it into smaller containers so he does not have to lift the big container, which he has dropped in the past. (TR 218). Plaintiff cannot write legibly anymore and can use the computer for only ten to fifteen minutes before he has to stop. (TR 221). He has spasms and cramping in his hands if he uses them for too long and he now uses voice recognition software on his computer so it types as he talks. (TR 221). He has pins and needles sensation in his hands

and feet almost constantly, worse with hot weather. (TR 221). If he drops something, he can get down to pick it up, but getting back up is difficult and he uses his cane to do so. (TR 219).

### B.     Medical Evidence

In April 2004 Plaintiff began treating with Martin I. Belkin, D.O., at the Michigan Institute for Neurological Disorders following complaints of left sided paresthesias and weakness, numbness, tingling and fatigue. (TR 134-37). In May 2004 Dr. Belkin reported that an MRI of the brain and cervical spine suggested a central nervous system demyelinating disease, such as is seen with multiple sclerosis. (TR 131). The doctor noted that Plaintiff reported significant fatigue for the prior few years, which was limiting more than fifty percent of his daily activities at that time. Plaintiff reported urinary urgency and significant difficulty in hot weather. (TR 131). The doctor discussed the nature of MS and started Plaintiff on weekly Avonex intramuscular injections and Provigil for fatigue. (TR 132).

In June 2004 Dr. Belkin noted the impressions of MS and nonradiating neck stiffness and pain. (TR 128). The doctor reported that Plaintiff's insurance would not cover the Provigil and he had not yet started Avonex, because of insurance denial. (TR 127). Plaintiff had L'Hermitte's sign and pinprick sensation was decreased in the left fingers as compared to the right. (TR 128). The doctor noted that Plaintiff "may return to work light duty." (TR 128). Visual testing on June 11, 2004 "evoked responses within normal limits" and "[n]o evidence of optic pathway abnormality." (TR 126). Plaintiff saw Dr. Belkin a second time in June and again in August and November 2004. (TR 120-26). By November 2004 he was taking the Avonex, had significant flu-like symptoms and irritability, noted less tingling in the extremities, no more pain with neck flexion and his primary complaint was significant fatigue which was worse with a hard day at work. (TR 120). Plaintiff

reported significant urinary urgency and frequency which appeared to be worsening. (TR 120). The doctor prescribed Adderall for fatigue and Detrol for urinary complaints. (TR 121).

On December 7, 2005 Plaintiff underwent a state agency examination with R. Patel, M.D. (TR 138-40). Dr. Patel noted that Plaintiff's functional capacity of walking was unlimited and he denied any specific neurological deficit. (TR 138). Plaintiff reported continuous weakness and fatigue. (TR 138). Dr. Patel noted that on clinical examination "there is no neurological impairment present" and that Plaintiff's multiple sclerosis was well controlled without medication and he was in remission. (TR 140).

Shahida Mohiuddin, M.D., completed a Physical Residual Functional Capacity Assessment on December 27, 2005. (TR 146-53). The doctor concluded that Plaintiff can lift and/or carry 50 pounds occasionally and 25 pounds frequently, stand and/or walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday and is unlimited in the ability to push and/or pull consistent with the lifting restrictions. (TR 147). He should avoid concentrated exposure to extreme heat, cold, humidity and hazards such as machinery and heights and is limited to only occasional performance of postural activities such as climbing, balancing, stooping, kneeling, crouching and crawling. (TR 150).

Plaintiff treated with Dr. Belkin again from April 24, 2006 through April 17, 2008. (TR 170-86, 191-92). In April 2006 Dr. Belkin noted that Plaintiff had recently been involved in a clinical study utilizing rituximab for relapsing/remitting multiple sclerosis but unblinding had not yet taken place in the study. (TR 170). The doctor reported that Plaintiff had developed depression following use of Avonex, had difficulty tolerating the side effects and did not want to start it again. (TR 170). The doctor again noted Plaintiff's significant complaints of fatigue. (TR 170). His urinary urgency

was well-controlled with Detrol, but he had developed some bowel urgency and tightness around the abdominal region. (TR 170). His gait was "narrow-based and steady." (TR 171). On August 21, 2006 Dr. Belkin reported that Plaintiff's B cell count had remained low so he suspected that Plaintiff was on active medication during the rituximab trial. (TR 173). In August and October 2006 Plaintiff continued to complain of fatigue and aching in his feet when he first stands. (TR 173, 176). In October 2006 the doctor noted that Plaintiff continued to have urinary urgency because he was unable to take Detrol medication due to its expense. (TR 176).

Plaintiff treated with Dr. Khater from March 23, 2007 to October 31, 2007. (TR 157-68). On March 23, 2007 Dr. Khater noted that Plaintiff complained of a "flare up" of his MS. (TR 158). Plaintiff reported fatigue, bladder control problems, weakness in his legs and being "off balance." (TR 158). In April 2007 the doctor noted a fatty liver and increased liver enzymes. (TR 163).

Dr. Belkin next examined Plaintiff on October 9, 2007. (TR 180). Dr. Belkin reported that Plaintiff continued to report urinary urgency but that Ditropan had helped and fatigue remained a significant complaint. (TR 180). L'Hermitte's sign was present, position and pinprick sensation were intact and symmetric and gait was "fairly steady." (TR 180-81). Plaintiff reported that he was unable to start Copaxone injections due to insurance issues and the doctor noted that they would again try to put Plaintiff on daily Copaxone injections as an immunomodulatory agent. (TR 180-81). An October 15, 2007 MRI of the brain revealed "multiple areas of hyperintense signal changes on the T2-weighted and FLAIR images" and a solitary legion adjacent to the frontal horn of the right lateral ventricle consistent with multiple demyelinating plaques. (TR 182-85). An MRI of the cervical spine did not reveal any abnormal cord signal but showed limited reversal of the usually lordotic cervical cord, small anterior thecal sac defect at C3-C6, and C5-C6 and C6-C7 appeared to

demonstrate multilevel degenerative disc change. (TR 182-83, 185).

Examination in December 2007 showed that Plaintiff's gait continued to be "narrow-based and steady," he was tolerating the Copaxone well, denied any new weakness in his extremities other than general weakness and fatigue remained a "prominent symptom for him." (TR 184). He reported occasional numbness and tingling in his hands "but nothing that persists." (TR 184). Ditropan "definitely helped his urinary urgency" and he complained of some bowel urgency. (TR 184). Plaintiff did not see Dr. Belkin again until April 17, 2008 when the doctor noted Plaintiff's complaints of fatigue and general weakness and his report that simple housework tasks such as vacuuming and doing dishes were extremely difficult due to tiring easily. (TR 191). The doctor noted that Plaintiff was ambulating with a cane "as he feels his balance is somewhat off but denies any dizziness." The doctor noted that on examination, there was no L'Hermitte's sign, extraocular movements were full, strength was full, reflexes were fairly symmetric and Plaintiff's gait was "narrow-based and steady." (TR 191). The doctor noted that "[n]o definite long tract signs were seen currently." (TR 191). The doctor concluded that the "most significant problem for Mr. Bryant is that of fatigue and a feeling of generalized weakness." (TR 191). The doctor gave Plaintiff samples of Provigil to treat fatigue, discontinued Amantadine and noted that he was hesitant to use stimulant agents given Plaintiff's prior addictive problems and his elevated blood pressure. (TR 192).

### C.     Vocational Expert Testimony

The Vocational Expert (VE) testified that Plaintiff's past work as a machine tool pipe fitter and sprinkler fitter was skilled and heavy exertion and as a welder was skilled and very-heavy and in these positions the skills were job-specific and not transferable. (TR 226). The ALJ asked the

VE to consider an individual who was a younger person, high school graduate, limited to light level work and further limited to not working around extreme heat or cold temperatures. (TR 226). The VE testified that such an individual could not perform Plaintiff's past work. (TR 226). She testified that such an individual could perform the light unskilled jobs of cashier (52,000 in the region defined as the lower two-thirds of Michigan) and stock clerk (12,000 in the region). (TR 227).

The ALJ changed the hypothetical question to an individual limited to sedentary work with a required sit/stand option, including sitting for a half-hour to forty-five minutes before standing for "a little while," and the aforementioned limitation from temperature extremes. (TR 227). The VE testified that the individual could perform the jobs of general office clerk (10,200 in the region) and cashier (9,800 in the region). (TR 227). The VE testified that if such an individual needed to use a cane during the time that he would be standing, the cashier position would likely be impacted because the individual would need the use of both hands. (TR 227). The VE would cut the general office clerk job to 5,100 positions because walking and carrying items requires two hands. (TR 227). The VE clarified that an unskilled general office clerk is generally not required to use a computer or typewriter. (TR 228). The VE testified that unscheduled breaks such as performing an activity for twenty to thirty minutes then needing to rest for fifteen minutes would impact performance of the jobs. (TR 228). The VE testified that in these jobs there would typically be a fifteen minute break before lunch and again in the afternoon and a thirty minute lunch. (TR 228). She testified that the cashier needed to be on-task at least 90 percent of the time, the officer clerk needed to be on-task 80 to 85 percent of the time and the worker could generally miss work due to physical reasons no more than one day per month. (TR 228).

### IV.     ADMINISTRATIVE LAW JUDGE'S DETERMINATION

The ALJ found that although Plaintiff had not engaged in substantial gainful activity since January 1, 2005, the alleged onset date, met the insured status requirements of the Social Security Act through December 31, 2009 and suffered from obesity, multiple sclerosis and chronic fatigue, he did not have an impairment or combination of impairments that meets or medically equals the Listing of Impairments. (TR 17-18). The ALJ found that Plaintiff was not entirely credible and he retains the ability to perform a limited range of work at the sedentary level. (TR 18). The ALJ concluded that there are jobs that exist in a significant number in the national economy that Plaintiff can perform. (TR 20).

## V.     LAW AND ANALYSIS

### A.     Standard Of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this Court to try cases *de novo*, resolve conflicts in the evidence or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536

(6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

### B.  Analysis

#### 1.  *Scope of the Court's Review*

Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff was required to show that:

(1)  he was not presently engaged in substantial gainful employment; and

(2)  he suffered from a severe impairment; and

(3)  the impairment met or was medically equal to a "listed impairment;" or

(4)  he did not have the residual functional capacity to perform his relevant past work.

*See* 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (2009). If Plaintiff's impairments prevented him from doing his past work, the Commissioner, at step five, would consider his residual functional capacity ("RFC"), age, education and past work experience to determine if he could perform other work. If he could not, he would be deemed disabled. *See id*. §§ 404.1520(g), 416.920(g). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the

vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

Plaintiff raises two arguments on appeal. First, Plaintiff argues that the ALJ did not properly assess Plaintiff's credibility and complaints of fatigue and limitations and that the ALJ's decision at step five is not supported by substantial evidence because the ALJ's hypothetical question to the VE was not accurate. (Docket nos. 10).

### 2.     *Whether the ALJ Properly Assessed Plaintiff's Complaints of Fatigue*

Plaintiff argues that the ALJ did not properly assess Plaintiff's credibility, specifically his complaints of fatigue, and argues that the treating physician's medical evidence demonstrates that he has multiple sclerosis with persistent complaints of significant fatigue that limits his ability to perform more than minimal daily activities and requires frequent unscheduled breaks[2]. (Docket no. 10). The ALJ found that while Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms," his statements regarding the intensity, persistence and limiting effects of his symptoms were not completely credible. (TR 19).

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters,* 127 F.3d at 531. Credibility assessments are not insulated from judicial

---

[2] The only limitation that Plaintiff challenges specifically with respect to the ALJ's credibility determination is the fatigue. Plaintiff, however, raises both his fatigue-related limitations and an allegation that he needs to use a cane in his step five argument. Therefore, the Court will address the ALJ's findings with respect to both Plaintiff's fatigue and his use of a cane to ambulate.

review. Despite deference due, such a determination must nevertheless be supported by substantial evidence. *See id.* An ALJ's credibility determination must contain "specific reasons . . . supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p. "It is not sufficient to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" *Id.* "The adjudicator may find all, only some, or none of an individual's allegations to be credible" and may also find the statements credible to a certain degree. *See id.*

Furthermore, to the extent that the ALJ found that Plaintiff's statements are not substantiated by the objective medical evidence in the record, the Regulations explicitly provide that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work . . . solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2). In addition to objective medical evidence, the ALJ must consider all the evidence of record in making his credibility determination. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(2); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994).

As an initial matter, the Court notes that the ALJ accepted Dr. Belkin's diagnosis that Plaintiff suffers from the severe impairments multiple sclerosis and also severe fatigue. Despite these findings, the ALJ did not properly address Plaintiff's alleged limitations related to fatigue. Plaintiff argues that Dr. Belkin's opinions support the allegation that Plaintiff suffers "significant fatigue that limits his ability to perform more than minimal daily activities and requires frequent unscheduled breaks." (Docket no. 10).

The ALJ properly expanded his findings regarding Plaintiff's subjective reports of symptoms to consider evidence other than objective medical evidence. The ALJ appeared to consider Plaintiff's medications when noted that there is no evidence that Plaintiff failed to receive significant relief of symptoms from the medication. (TR 19). This is correct with respect to Plaintiff's treatment of urinary urgency with Ditropan. (TR 180, 184, 191). The record also shows that Plaintiff's B-cell count remained low allowing his doctor to conclude that Plaintiff had received rituximab medication during a clinical trial ending in March 2006. (TR 170-71). With respect to Plaintiff's fatigue, however, there is no evidence that his fatigue was responsive to medication despite Dr. Belkin's attempts to treat it.

Dr. Belkin's notes show that Dr. Belkin was treating Plaintiff's fatigue, which he repeatedly noted as one of Plaintiff's most significant and severe complaints. (TR 173, 177, 180, 184, 191). On several occasions Dr. Belkin prescribed different medication, including Adderall, Amantadine and Provigil. (TR 121, 171, 174). On April 17, 2008 Dr. Belkin noted that Amantadine has provided "no help in regard to his fatigue." (TR 191). On two occasions, Dr. Belkin noted his concerns about prescribing a stimulant in light of Plaintiff's history of cocaine and/or amphetamine abuse and elevated blood pressure. (TR 185, 192). Dr. Belkin's notes do not support a conclusion that the fatigue was relieved by medication.

The ALJ also relied on Plaintiff's activities of daily living to find that Plaintiff's symptoms were not credible. (TR 19). In discussing whether Plaintiff's symptoms are consistent with the objective medical and other evidence, the ALJ stated that Plaintiff is "fairly active" and pointed out that Plaintiff has custody of his son, gets up at five-thirty a.m. every morning to make sure his son is awake, prepares dinner, researches his impairments on the internet, and is able to wash dishes, do

13

laundry, vacuum and clean the bathroom, watches television, reads, plays card games on the computer and attends church. (TR 19). The ALJ concluded that "this level of activity is inconsistent with the claimant's allegation of disability." (TR 19).

First, the ALJ did not specifically mention Plaintiff's claims of fatigue in making these findings. Second, the ALJ's recitation of Plaintiff's activities does not mention the level of activity to which Plaintiff's reported he engages in each of these activities. (TR 19). The record shows that Plaintiff's seventeen year old son lives with him, but Plaintiff reported that his son assists him, including by carrying his groceries for him and mopping the bathroom floor. (TR 98, 99). Plaintiff testified that he makes dinner for his son, but that he takes breaks every ten to fifteen minutes and it may take him all day with his break periods. (TR 98, 222). He described making soups and oven-cooked meals so he does not have to stand while it cooks. (TR 95). He also cooks hamburgers and grilled cheese sandwiches. (TR 97). He uses a shower chair due to fatigue. (TR 97).

With respect to vacuuming, Plaintiff reported that if he stands and vacuums and does things around the home for one hour, he cannot do anything for days afterward. (TR 95). When he washes dishes he soaks them first, then washes only a few at a time with breaks in between. (TR 98). He only searches the internet for ten to fifteen minutes at a time and some days when he reads he loses his concentration and cannot remember what he read. (TR 103, 221). The ALJ has not explained whether and/or why he discounted Plaintiff's reported level of engagement in these activities. He simply concluded that the listed activities are inconsistent with Plaintiff's disability allegations. (TR 19). The activities as described by Plaintiff are not substantial evidence supporting the ALJ's credibility determination with respect to the extent of Plaintiff's fatigue. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248-49 (6th Cir. 2007) (The ALJ erred in finding that claimant was "fairly

14

active" by noting minimal daily functions that were not comparable to work activities, mischaracterizing claimant's testimony regarding the scope of her daily activities, and failing "to examine the physical effects coextensive with their performance.").

In this instance, where Plaintiff has alleged disabling fatigue, which is a symptom of multiple sclerosis, the ALJ has found that Plaintiff suffers from impairments of multiple sclerosis and severe fatigue, and the ALJ has not addressed the alleged fatigue and related symptoms in his findings, the case must be remanded for further proceedings.  *See Fisher v. Barnhart*, 393 F. Supp. 2d 343, 346-47 (E.D. Pa. 2005) (focusing on the "singular nature of the disease in terms of cyclical impairment," in addressing "standard M.S. related symptoms of fatiguability (excessive) and heat intolerance"); *Claussen v. Chater*, 950 F. Supp. 1287, 1297 (D. N.J. 1996) (Claimant's assertion of debilitating fatigue appeared to be reasonably supported by the medical evidence where multiple sclerosis is a "disease characterized by fatigue" under the Administration's guidelines.); and *Parish v. Califano*, 642 F.2d 188, 193 (6th Cir. 1981) ("In conditions which are episodic in character, such as multiple sclerosis or myasthenia gravis, consideration should be given to frequency and duration of exacerbations, length of remissions, and permanent residuals.").

With respect to Plaintiff's allegation that he must use a cane, the ALJ relied upon Dr. Patel's findings, including that Plaintiff's walk and gait were stable and within normal limits[3]. Dr. Patel's findings are consistent with even the most recent of Dr. Belkin's reports. On April 17, 2008 Dr.

---

[3] Plaintiff also argues that the ALJ relied on the results of a consultative examination which "took place prior to the plaintiff's alleged onset dated of disability." (Docket no. 10 at p. 10, TR 18).  Plaintiff's statement is incorrect with respect to either of the consultant's reports cited by the ALJ.  (TR 18).  Plaintiff's alleged onset date is January 1, 2005.  The Physical Residual Functional Capacity Assessment to which Plaintiff refers is dated December 27, 2005, *after* the alleged date of onset.  (TR 146-55).  Dr. Patel's examination took place on December 7, 2005. (TR 138-44).

Belkin noted that Plaintiff "ambulates with a cane as he feels his balance is somewhat off but denies any dizziness." (TR 191). On examination, Dr. Belkin specifically noted that Plaintiff's gait was "narrow-based and steady." (TR 191). With respect to Plaintiff's allegation that he needs a cane to ambulate, the ALJ correctly pointed out that Plaintiff's gait is described as "steady" by both the examining consultant and Plaintiff's own physician. (TR 18). There is no evidence that a cane was ever prescribed or recommended and examiners from 2005 to April 2008 have consistently noted Plaintiff's gait as "steady." There is simply no evidence of record, other than Plaintiff's allegations, to support a finding that he needs a cane to ambulate or to alternate between a sit/stand option at work. By Plaintiff's own report he can wash dishes, and despite the allegation that he rests often due to fatigue during this task, he does not allege that he uses the cane to stand while washing dishes or that he is otherwise limited to the use of one hand while performing tasks. The ALJ's findings regarding the credibility of Plaintiff's allegations about symptoms related to his ability to ambulate are supported by substantial evidence.

### 3.     *Whether the ALJ's Findings At Step Five Are Supported By Substantial Evidence*

Plaintiff argues that the ALJ's hypothetical question to the VE was not accurate because it did not contain limitations related to his fatigue and his need to use a cane. (Docket no. 10). In a hypothetical question posed to the VE, an ALJ is required to incorporate only those limitations which he finds credible and supported by the record. *See Casey v. Sec'y of Health and Human Serv.*, 987 F.2d 1230, 1235 (6th Cir. 1993). The ALJ found that Plaintiff has the RFC to perform sedentary work allowing for a sit/stand option and no exposure to temperature extremes. The ALJ incorporated these limitations into the hypothetical question to the VE.

The ALJ's findings related to Plaintiff's use of the cane and ambulation-related symptoms

16

is supported by substantial evidence. Therefore, the ALJ did not err in failing to include the use of a cane in his hypothetical, despite the VE's testimony that use of a cane would impact the cashier jobs and reduce the number of office clerk jobs. The ALJ's credibility determination regarding Plaintiff's fatigue is not supported by substantial evidence, so it is not possible to determine whether the hypothetical question posed to the VE was accurate and whether the ALJ's findings at step five are supported by substantial evidence. The issue of fatigue is material because the VE testified that the need to take unscheduled rest breaks as a result of fatigue would impact Plaintiff's performance of these jobs. The ALJ must perform a new step four determination and, if necessary, step five determination and include those limitations he finds credible and supported by the record.

## VI.     CONCLUSION

The ALJ's opinion is not supported by substantial evidence and the Court should remand this matter pursuant to step four of 42 U.S.C. § 405(g) for further proceedings as set forth herein. Defendant's Motion for Summary Judgment (docket no. 15) should be DENIED, that of Plaintiff (docket no. 10) GRANTED IN PART and the instant complaint dismissed.

## REVIEW OF REPORT AND RECOMMENDATION

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation.

*Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: February 03, 2010          s/ Mona K. Majzoub
                                  MONA K. MAJZOUB
                                  UNITED STATES MAGISTRATE JUDGE


**PROOF OF SERVICE**

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: February 03, 2010          s/ Lisa C. Bartlett
                                  Case Manager